GUTRIDE SAFIER LLP
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY KENT and ROBIN SAVAGE, individuals, on behalf of themselves, the general public, and those similarly situated,<br><br>                    Plaintiffs,<br><br>     v.<br><br>RETAIL SERVICES & SYSTEMS, INC., D/B/A TOTAL WINE & MORE,<br><br>                    Defendant. | CASE NO.<br><br>CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; AND UNJUST ENRICHMENT<br><br>JURY TRIAL DEMANDED |

CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................... 1

THE PARTIES........................................................................................................................... 2

JURISDICTION AND VENUE ................................................................................................ 3

TOLLING AND RELATED ARBITRATION PROCEEDINGS............................................. 3

SUBSTANTIVE ALLEGATIONS ........................................................................................... 5

     A.    Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies. ........................................................ 5

     B.    Defendant Falsely Informed Users That They Could Reject the Website's Use of "All" Cookies. ............................................................................................ 9

     C.    The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendant's Website. .............................................................. 15

           1.    The Website Causes the Interception of the Contents of Communications. ................................................................................... 15

           2.    Adobe Cookies.......................................................................................... 16

           3.    Microsoft Bing Cookies........................................................................... 21

           4.    Additional Third-Party Cookies............................................................... 24

     D.    The Third Parties Intercept User Communications While in Transit. ................ 25

     E.    The Signaling and Addressing Information Intercepted by the Third Parties....................................................................................................................... 26

     F.    The Private Communications Collected are Valuable. ....................................... 28

PLAINTIFFS' EXPERIENCES ............................................................................................. 29

CLASS ALLEGATIONS ....................................................................................................... 34

CAUSES OF ACTION ........................................................................................................... 36

     First Cause of Action: Invasion of Privacy........................................................ 36

     Second Cause of Action: Intrusion Upon Seclusion.......................................... 39

     Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631) .......................................... 41

     Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) ................................ 44

     Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation............. 45

     Sixth Cause of Action: Unjust Enrichment........................................................ 49

PRAYER FOR RELIEF .......................................................................................................... 50

CLASS ACTION COMPLAINT

Plaintiffs Jeffrey Kent and Robin Savage ("Plaintiffs") bring this action on behalf of themselves, the general public, and all others similarly situated against Retail Services & Systems, Inc. d/b/a Total Wine & More ("Defendant" or "Total Wine"). Plaintiffs' allegations against Defendant are based on information and belief and the investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based on their personal knowledge.

## INTRODUCTION

1.      This Class Action Complaint concerns egregious violations of consumer privacy and breach of consumer trust in violation of California law. When consumers visit Defendant's website (www.totalwine.com, the "Website"), Defendant displays to them a popup cookie consent banner. Defendant's cookie banner discloses that the Website uses cookies but expressly gives users the option to control how they are tracked and how their personal data is used. Defendant assures visitors that they do not have to "Accept" cookies—they can instead choose to "Reject All" cookies in use on the Website, as shown in the following screenshot:



2.      Like most internet websites, Defendant designed the Website to include resources and programming scripts from third parties that cause those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. Unlike many websites, however, Defendant affirmatively represented that users could browse the Website without being tracked, followed, or targeted by third-party data brokers and advertisers. Those representations were false.

3.      Even after users elect to reject all cookies by clicking the "Reject All" button on the popup cookie consent banner, Defendant nonetheless caused multiple third parties— including Adobe Inc. (dpm.demdex.net and omtrdc.net), Microsoft Corporation (Microsoft Bing), Everest Technologies, Inc. (cm.everesttech.net), and Moveable Ink (c2op6nqb.micpn.com)—to place and/or transmit cookies that track users' website browsing activities and intercepted their private communications on the Website.

CLASS ACTION COMPLAINT

4. Contrary to users' express rejection of all cookies and tracking technologies on the Website, Defendant caused cookies, including the Third Parties' cookies, to be sent to Plaintiffs and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These cookies permitted the Third Parties to track and collect data in real time regarding Website visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

5. The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

6. This type of tracking and data sharing is exactly what the Website visitors sought to avoid when they clicked the "Reject All" button on the Website's popup cookie consent banner. Defendant falsely told Website users that it respected their privacy choices and would refrain from tracking and data sharing when users rejected "All" cookies. Despite receiving clear notice of users' lack of consent, Defendant ignored those choices and violated state statutes and tort duties owed to Plaintiffs and those similarly situated Website users.

## THE PARTIES

7. Plaintiff Jeffrey Kent is, and was at all relevant times, an individual and resident of San Francisco, California. Plaintiff intends to remain in California and makes his permanent home there.

8. Plaintiff Robin Savage is, and was at all relevant times, an individual and resident of Laguna Woods, California. Plaintiff intends to remain in California and makes her permanent home there.

CLASS ACTION COMPLAINT

9.      Defendant Retail Services & Systems, Inc. is a Maryland corporation with its principal place of business in Bethesda, Maryland. Defendant does business as Total Wine & More. Upon information and belief, Defendant owns, manages, operates, and/or controls the Total Wine & More business and Website, including through affiliated entities and state-specific subsidiaries such as California Fine Wine & Spirits, LLC.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendant are citizens of different states.

11.     The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

12.     Further, the Private Communications and data that Defendant causes to be transmitted to Third Parties are routed through servers located in California.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

14.     Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## TOLLING AND RELATED ARBITRATION PROCEEDINGS

15.     The delayed discovery rule applies to Plaintiffs' claims. Plaintiffs were unaware that, despite rejecting "All" cookies on the Website, Defendant nonetheless caused third-party cookies to be sent to their browsers, stored on their devices, and transmitted to the Third Parties along with their private user data. Plaintiffs could not reasonably have discovered this conduct at the time of their Website visits because it occurred through hidden, technical processes not visible to ordinary users. Nothing about Plaintiffs' experience on the Website would have alerted

CLASS ACTION COMPLAINT

a reasonable user that their selections were not being honored. Plaintiffs lacked the technical expertise and specialized tools necessary to determine whether the Website honored their opt-out selections or instead continued transmitting their data notwithstanding those selections, and they did not discover Defendant's conduct until a later investigation revealed it.

16. The Website's Terms and Conditions of Use ("TOU") contain an arbitration provision that purports to require Website visitors to arbitrate disputes with Defendant before the American Arbitration Association ("AAA").

17. Accordingly, on January 13, 2025, Plaintiff Savage filed a demand for arbitration against Defendant with the AAA in San Francisco. *See* Ex. A. Plaintiff Savage's arbitration asserted claims arising from the same conduct alleged herein.

18. Phillip Francis Shinn was appointed as the arbitrator.

19. Following a preliminary management hearing on October 8, 2025, the Arbitrator ordered briefing regarding arbitrability of the dispute.

20. On March 9, 2026, the Arbitrator issued an order concluding that he lacked jurisdiction to determine whether an arbitration agreement had been formed between the parties. The Arbitrator further determined that a court must decide whether a valid arbitration agreement exists and stayed the arbitration for ninety (90) days pending such a determination. The order also scheduled a further preliminary hearing for June 11, 2026. *See* Ex. B.

21. On June 11, 2026, by stipulation of the parties, the Arbitrator entered an Order for Dismissal Without Prejudice. *See* Ex. C.

22. Despite exercising reasonable diligence, Plaintiffs were unaware of Defendant's conduct because Defendant affirmatively represented that users could reject "All" cookies while simultaneously concealing that such tracking would occur regardless of users' selections. This combination of misrepresentation and omission prevented Plaintiffs from discovering their claims earlier. Further, Plaintiff Savage's claims were equitably tolled by the filing of the arbitration proceeding because Defendant had notice of the claims (and her intent to pursue them in court as a putative class action). Defendant is not prejudiced by the timing of this action, as it has long been on notice of the conduct at issue, including through the October 14, 2023 demand

- 4 -

CLASS ACTION COMPLAINT

letter describing substantially similar claims and Plaintiff Savage's filing of the arbitration proceeding. These circumstances, including Defendant's concealment and misleading representations and Plaintiff Savage's pursuit of her claims in the arbitration proceeding, warrant tolling of the statute of limitations.

### SUBSTANTIVE ALLEGATIONS

**A.    Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies.**

23.    Every website, including the Website, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to and from Internet users' browsers. For example, when a user clicks on a hyperlink on the Website, the user's browser sends a "GET" request to the Website's server. The GET request tells the Website server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address, which allows the Website server to identify the origin of the request and return the response.

24.    An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

25.    As a result, Defendant knew or should have known that the devices used by Plaintiffs and Class members to access the Website were located in California.

26.    Defendant voluntarily integrated "third-party resources" from the Third Parties into its Website programming. "Third-party resources" refer to tools, content or services provided by third parties, such as analytics tools, advertising networks, or payment processors,

- 5 -

that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendant's use of the third-party resources on the Website is done so pursuant to agreements between Defendant and those Third Parties.

27. The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

28. First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Website's server). First-party cookies are used to track users when they repeatedly visit the same website.

29. A third-party cookie is set by a third-party domain/webserver (e.g., dpm.demdex.net, bat.bing.com, cm.everesttech.net, etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third-parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

30. As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Website are transmitted to those third parties, enabling them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendant, including the following:

CLASS ACTION COMPLAINT

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;

- **Visit History**: Information about the frequency and total number of visits to the Website;

- **Website Interactions:** Data on which links, buttons, or ads on the Website that a user clicks;

- **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;

- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website content;

- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;

- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;

- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;

- **Referring URL**: Information about the website that referred the user to the Website;

- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;

- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or

- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible, including whether the user is located in California.

- 7 -

CLASS ACTION COMPLAINT

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

31. Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to enhance website performance and generate revenue through data collection and targeted advertising.

32. Defendant owns and operates the Website, which allows visitors to, among other things, browse and obtain information regarding wines, spirits, beer, and other alcoholic beverages, search for products, compare product offerings, locate Defendant's retail stores, and review pricing and promotions. As users interact with the Website—including by entering information into forms, searching for retail locations and products, viewing product details, selecting items, clicking links, and navigating webpages—they communicate Private Communications to Defendant, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

33. Defendant chose to install or integrate its Website with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its Website, or that Defendant causes to be loaded. Because Defendant controls the Website's software code, and is capable of determining whether a user is accessing the Website from California, it has complete control

- 8 -
CLASS ACTION COMPLAINT

over whether first-party and third-party cookies are placed on its California users' devices and/or transmitted to third parties.

34.     Defendant explained the third-party cookies it used on the Website as follows in its Privacy Policy[1]:

> Like many companies, we use cookies on our Sites. Cookies are pieces of information shared between your web browser and a website. Use of cookies enables a faster and easier experience for the user.
>
> …
>
> We do use third-party cookies on our Sites, as well as third party provided web beacons (please see the section on Web Beacons below). These cookies are used by us and our marketing partners to better understand your preferences and to tailor and improve your experience on the site based on our impressions of your interests.
>
> More specifically, our Sites use Google Analytics and Adobe Site Catalyst, which are web analytic tools provided by Google, Inc. and Adobe Inc., respectively. These services use cookies to help our Sites analyze how users use the Sites. The information generated by the cookies about your use of the Sites (including your IP address) will be transmitted to and stored by these vendors on servers in the United States. These vendors will use this information for the purpose of evaluating your use of the Sites, compiling reports on Site activity, and providing other services relating to Site activity and internet usage for Total Wine.
>
> …
>
> Along with the above noted uses, we use cookies for the following purposes:
>
> …
>
> <u>Marketing & advertising cookies:</u> Total Wine does not "sell" your personal information as the word "sell" is commonly understood. In other words, we are [sic] do not give your personal information to third parties in exchange for money. However, our Sites do use cookies that may be used by third parties to build a profile of your interests and show you relevant advertisements on other sites. These cookies may also be used to enable you to share pages and content that you find interesting on our Sites through third-party social networking and other websites. The cookies do not store directly personal information, but are based on uniquely identifying your browser and Internet device. If you do not allow these cookies, you will experience less targeted advertising and may not be able to share pages or content you find interesting through third-party social networking sites.

**B.      Defendant Falsely Informed Users That They Could Reject the Website's Use of**

---

[1] Total Wine Privacy Policy (Effective Date: July 1, 2023) (previously available at https://www.totalwine.com/customer-service/privacy-policy) (the "Privacy Policy"). Defendant has subsequently updated its Privacy Policy but, based on information and belief, this version was in effect at the time Plaintiffs rejected cookies on the Website.

CLASS ACTION COMPLAINT

"All" Cookies.

35. When Plaintiffs and other consumers in California visited the Website, the Website immediately displayed to them a popup cookie consent banner. As shown in the screenshot below, the cookie consent banner (captioned as a "Privacy Notice") provided Plaintiffs and other Website users the option to manage or modify "Cookie Settings," or to instead "Accept" cookies or "Reject All" cookies, as shown in the following screenshot from the Website:

**Privacy Notice**
Total Wine & More has updated its Privacy Policy. Please review, as the changes may impact your privacy rights.
Cookie Settings    Reject All    Accept

36. Plaintiffs and other Website users who clicked the "Reject All" button, thereby indicating their choice and/or agreement to decline or reject all cookies and tracking technologies in use on the Website, could then continue to browse the Website, as the popup cookie consent banner disappeared.

37. Defendant's popup cookie consent banner led Plaintiffs, and all those Website users similarly situated, to believe that they declined or rejected "All" cookies and tracking technologies. The banner further reasonably led Plaintiffs and those Website users similarly situated to believe that Defendant would not allow third parties, through cookies, to access their Private Communications with the Website, nor sell their personal data, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking the "Reject All" button.

38. Defendant's representations, however, were false. In truth, Defendant did not abide by Plaintiffs' or other users' wishes. When Plaintiffs and other Website users clicked the "Reject All" button, they provided notice to Defendant that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Website, nor sell their personal data.

CLASS ACTION COMPLAINT

39.    Nevertheless, even after receiving that notice, Defendant caused the Third Parties' tracking cookies to be placed on Website users' browsers and devices and/or transmitted to the Third Parties along with user data.

40.    In particular, when users clicked the "Reject All" button, Defendant nonetheless continued to cause the Third Parties' cookies to be placed on Plaintiffs' and users' devices and/or transmitted to the Third Parties along with user data, which enabled them to collect user data in real time that disclosed Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by rejecting "All" cookies and tracking technologies, Defendant failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

41.    Some aspects of the operations of the Third Parties' cookies on the Website can be observed using specialized tools that log incoming and outgoing Website network transmissions. The following screenshots, obtained using one such tool, show examples of the Third Parties' cookies being transmitted from a Website user's device and browser to the Third Parties even after the user clicked the "Reject All" button on the Website's popup cookie consent banner:

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT



42.    The screenshots above show the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third-party websites while the user visited and interacted with Defendant's Website at https://www.totalwine.com. The screenshots depict only network traffic occurring *after* the user rejected "All" cookies by clicking the "Reject All" button. As shown above, despite the user's rejection of all cookies, or at least all "Marketing & advertising cookies" (from which users could opt-out, as Defendant, in its Privacy Policy, specifically represented), the user's interactions with the Website resulted in the user's browser making a large number of GET and POST HTTP requests to third-party web domains like dpm.demdex.net, bat.bing.com, cm.everesttech.net, and others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These

CLASS ACTION COMPLAINT

screenshots demonstrate that Defendant caused third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after consumers declined or rejected "All" cookies and tracking technologies by clicking the "Reject All" button. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's rejection of all such cookies.

43.     Plaintiffs' and other Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

44.     As users interact with the Website, even after clicking the "Reject All" button, thereby declining or rejecting the use of "All" cookies and similar technologies, including for marketing and advertising, as well as the sale or sharing of the user's personal information with third parties for such functions, or other purposes, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data. The third-party cookies that Defendant wrongfully allows to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Website. Because third-party cookies cause the Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

45.     The Third Parties' code that the Website causes to be loaded and executed by the user's browser constitutes a wiretap because, when it is executed, it causes the Third Parties—

- 14 -

separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on Website users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

**C.     The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendant's Website.[2]**

**1.     The Website Causes the Interception of the Contents of Communications.**

46.     The Website includes search bars and other input fields that allow users to enter search queries and other information for the purpose of obtaining information from the Website. When users enter information into these fields, they intend to communicate the contents of their searches directly to Defendant through the Website and to receive information responsive to those searches.

47.     Defendant programmed the Website such that information reflecting the contents of users' searches is transmitted to the Third Parties contemporaneously with the users' communications with the Website. As described below, the Website causes users' search queries to be included in page URLs that are then transmitted to Third Parties while users are interacting with the Website.

48.     For example, when a user searches for products on the Website by entering a search query, the Website appends the user's full search query to the resulting page URL. Thus, the contents of the user's search become part of the URL generated by the Website. In the screenshot below, when a user searches for "wild turkey," the Website navigates to a URL ending in "?text=wild%20turkey," thereby embedding the user's search query directly into the URL:

---

[2] This section contains multiple examples of specific data being sent from a user's browser to third parties. Each example was collected after the user had rejected "All" cookies and tracking technologies in use on the Website.

CLASS ACTION COMPLAINT

49.     As described in more detail below, the Website causes page URLs—including URLs that reveal the contents of users' searches—to be transmitted to Adobe together with associated cookies and identifiers. Through these transmissions, Adobe receives information reflecting the substance of users' communications with the Website, notwithstanding users' attempts to reject all cookies.

**2.     Adobe Cookies.**

50.     Defendant causes third-party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to "Reject All" cookies, to and from the **demdex.net** and **omtrdc.net** domains. These domains are associated with Adobe Inc.'s Audience Manager, a data management platform, Adobe's Marketing Cloud, and Adobe's Experience Cloud Identity Service, a service which provides a universal, persistent ID to identify visitors across all Adobe products.

51.     These cookies are used to assign a unique identifier to each site visitor, which enables Adobe to consistently recognize and track users across different sessions and domains (i.e., cross-site tracking) and collect and synchronize user data to comprehensively observe and

CLASS ACTION COMPLAINT

evaluate user behavior online.[3] These cookies enable Adobe to obtain and store at least the following user data: (i) user identifier; (ii) website interactions; (iii) browsing history; (iv) visit history; (v) interests and preferences; and (vi) session information.[4]

52.    Adobe aggregates this cookie data with other data from multiple channels and devices, including web analytics, CRM systems, and e-commerce platforms, to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics, create audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.), and to enable targeted advertising and marketing analytics.[5]

53.    For example, the Adobe software code that Defendant causes to be stored on and executed by the Website user's device causes the following data to be sent to Adobe's domain, at omtrdc.net:

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

---

[3] *Id.*

[4] *See, e.g.,* Adobe Audience Manager User Guide: Data Collection Components (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/system-components/components-data-collection).

[5] *See, e.g.*, Adobe Audience Manager User Guide: Understanding Calls to the Demdex Domain (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/demdex-calls); Adobe Experience Cloud Identity Service overview (available at https://experienceleague.adobe.com/en/docs/id-service/using/intro/overview); Adobe Audience Manager Features (available at https://business.adobe.com/products/audience-manager/features.html); *see also* Audience Manager Overview (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/overview/aam-overview).

CLASS ACTION COMPLAINT



CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

```
38          },
39  ∨       "audienceManager": {
40            "blob":
              "RKhpRz8krg2tLO6pguXWp5olkAcUniQYPHaMWWgdJ3xzPWQmdj
              0y",
41            "locationHint": 9
42          }
43        },
44  ∨     "id": {
45  ∨       "customerIds": [
46  ∨         {
47              "authenticatedState": "authenticated",
48              "id": "41698164303247592162206145532301781178",
49              "integrationCode": "mcid",
50              "type": "DS"
51            }
52          ],
53          "marketingCloudVisitorId":
            "41698164303247592162206145532301781178",
54          "tntId": "3966022d12644a04a85a3f1c9ff55606.35_0"
55        },
56        "impressionId": "1460c399a22a4341920ca3d5ba7e60f2",
57  ∨     "notifications": [

58  ∨       {
59            "id": "dbb4d4ed9ff441d894395cad3110422c",
60  ∨         "parameters": {
61              "Cart ID": "212170981",
62              "Cart Qty": 1,
63              "Login Status": "anonymous",
64              "Login Status_V2": "Anonymous",
65              "MCID": "41698164303247592162206145532301781178",
66              "Shopping Store": "US-TX",
67              "Store ID/Number": "521",
68              "Store Name": "allen, tx"
69            },
70            "timestamp": 1696708869874,
71            "type": "display",
72  ∨         "view": {
73              "name": "product details"
74            }
75          }
76        ],
77        "requestId": "74979f525e6046bf996729665cf023fe"
78      }
```

POST   204 No Content   https://totalwine.tt.omtrdc.net/r
                         &version=2.9.0

Request  Header  Query  Body  Cookies  Raw  Summary  +         ☰

Key                        Value

s_vi                       [CS]v1|32682B667CE6C080-60000B130E35A49C[CE]

54.     The data indicates, among other things, that the user has viewed the page on the Defendant's website at the url "https://www.totalwine.com/wine/red-wine/merlot/old-merelo-merlot-single-vinyard..." As discussed above, if the user had entered a search query, then the full url—which would have included the search query—would be sent to Adobe.[6]

55.     The "sessionId" key is designed to persist during the entirety of the user's visit, enabling Adobe to link the user's pageviews across the website.

56.      Along with this data, the "referer" and "user-agent" headers are sent to Adobe. The "referer" header confirms that the user was viewing the Total Wine Website, and the "user-agent" header further confirms the user's device information.

57.     In addition, the Website causes the user's browser to send the "s_vi" cookie to Adobe. According to Adobe documentation, this cookie "[s]tores a unique visitor ID and timestamp."[7] Further, "[e]ach visitor ID is associated with a visitor profile on Adobe servers," and visitor profiles are set to persist for one year.[8]

58.     Finally, the data sent to Adobe includes the user's IP address, which can be used to determine a user's geolocation, including whether they are located in California.

### 3.     Microsoft Bing Cookies.

59.     Defendant also causes third-party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to "Reject All" cookies, to and from the **bat.bing.com** domain. "The webpage bat.bing.com is a host for Bing Ads Conversion tracking code. This webpage is owned by Microsoft[.]"[9] The domain is associated with Bing, Microsoft's search engine, as well as Microsoft's digital advertising and analytics platforms. When a webpage loads a bat.bing.com cookie, it "tells Microsoft Advertising about the user visits to [the] webpage."[10] Microsoft uses bat.bing.com cookies to "record[] what customers do on [a] website

---

[6] The data sent to Adobe indicates incorrectly that the user's store is located in Allen, Texas. The user, located in California, had actually selected a California store for the session, but the Website failed to send the correct store location to Adobe.

[7] https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/analytics.

[8] *Id.*

[9] https://answers.microsoft.com/en-us/msadvs/forum/all/does-batbing-track-your-browser-searches-and-sites/0a402f00-60c2-4d54-bd7d-81b67ccc7f13.

[10]https://help.ads.microsoft.com/apex/index/3/en/56959#:~:text=The%20most%20important%20request%20is,ma king%20when%20your%20webpage%20loads.

CLASS ACTION COMPLAINT

and send[] that information to Microsoft Advertising." [11] Microsoft then serves targeted ads to web users across its extensive ad networks, which utilizes its "rich" supply of gathered data to "reach more than a billion people[.]"[12]

60.    Bat.bing.com cookies collect consumers' (i) search history and browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information (including zip code[13]; gender[14]; age[15] (including identifying whether that person is a minor or not)); (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses). Bat.bing.com updates this information each time a user clicks on a website hosting a third-party bat.bing.com cookie.

61.    Bat.bing.com cookies help Microsoft track users' interactions with ads (e.g., clicking a link or making a purchase) and provide valuable metrics that advertisers use to measure ad campaign performance. Further, bat.bing.com cookies allow Microsoft to obtain and store at user data to "help [website owners] focus a campaign or ad group on potential audiences who meet [website owners'] specific criteria, so [website owners] can increase the chance that [consumers] see [website owners'] ads." [16] Further, Bing offers [website owners] valuable "conversion tracking," which is a "measure [of] the ROI (return on investment) of your advertising campaign by letting [website owners] assign a monetary value to the activities people complete on [Defendant's] website after clicking [website owners'] ad."[17]

62.    For example, the following data was sent to Microsoft when the user viewed the Old Merelo Merlot page on the Website after rejecting cookies:

---

[11] https://help.ads.microsoft.com/#apex/ads/en/56960/1.
[12] https://answers.microsoft.com/en-us/msadvs/forum/all/opt-out-of-audience-ads/753bc0fc-c04f-4e20-a94a-abaa950ccf31#:~:text=When%20you%20come%20to%20Microsoft,and%20rich%20first%2Dparty%20data.
[13] https://help.ads.microsoft.com/#apex/ads/en/60212/0.
[14] *Id.*
[15] *Id.*
[16] https://help.ads.microsoft.com/#apex/ads/en/60212/0.
[17] https://help.ads.microsoft.com/#apex/ads/en/56680/2.

CLASS ACTION COMPLAINT

63.     According to Microsoft documentation, the "MUID" cookie "[i]dentifies unique web browsers visiting Microsoft sites", and is "used for advertising, site analytics, and other operational purposes."[18]

64.     In addition, the "referer" and "user-agent" headers, along with the user's IP address, were sent to Microsoft along with each request.

65.     Microsoft also utilizes Bing data for its own purposes, including by using the data to tailor content and target advertisements to users. This profile enables Microsoft to deliver highly targeted ads within Microsoft's extensive advertising network Microsoft's revenue from its advertising network program has exceeded $10 billion as of 2022.[19]

---

[18] https://learn.microsoft.com/en-us/clarity/setup-and-installation/clarity-cookies.
[19] https://digiday.com/media/microsofts-ad-revenue-hit-10b-and-its-investing-is-a-sleeping-giant-about-to-wake/.

- 23 -

CLASS ACTION COMPLAINT

**4.    Additional Third-Party Cookies.**

66.    Defendant also causes third-party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to "Reject All" cookies, to and from other domains, including (i) cm.everesttech.net and (ii) c2op6nqb.micpn.com.

67.    The **everesttech.net** subdomain is associated with Everest Technologies, Inc., a technology company that offers DevOps, Automation, and Decision Intelligence ("Combine the power of Analytics, Machine Learning and AI") services."[20] The cm.everesttech.net domain collects a user's log and usage data ("IP address, device information, browser type and settings and information about your activity on the website . . . [and] pages and files viewed, searches and other actions you take such as what features you use [on the website]."[21] While Everest uses some of this data for IT management and tech support, it also uses the data collected for targeted advertising.

68.    The subdomain **c2op6nqb.micpn.com** is associated with Moveable Ink, an "autonomous marketing" company that uses its several software products to "create personalized customer experiences."[22] One Moveable Ink product, Studio, uses data to produce "tailored web content for every visitor" by interfacing with tools produced by online marketing companies Adobe and Salesforce, among others.[23] Moveable Ink uses "existing data" collected by its customers (including, on information and belief, the data collected by way of Defendant's cookies and similar technologies) to create "personalized experiences" for users of its customers' websites, including the Website.[24] The personalization provided by Moveable Ink, which is based on the collection of users' personal data, enhances Defendant's own marketing and advertising efforts.

69.    These cookies allow these Third Parties to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, (v) interests and preferences, (vi) shopping behaviors, (vii) device information,

---

[20] https://www.everesttech.com/services/?c=us.
[21] *Id.*
[22] https://movableink.com/.
[23] https://movableink.com/studio-web.
[24] https://movableink.com/why-movable-ink.

- 24 -

(viii) referring URLs, (ix) session information, (x) user identifiers, and/or (xi) geolocation data—including whether a user is located in California.

**D.    The Third Parties Intercept User Communications While in Transit.**

70.    On information and belief, the Third Parties intercept user communications while those communications are in transit from consumers' browsers to Defendant's Website. The Third Parties operate large-scale data ingestion systems designed to receive, read, and act upon incoming data streams in real time, as the data is transmitted over the network, before it is committed to storage. As the user data is transmitted over the wire, it is transmitted as a raw payload that cannot be used until the Third Party reads and processes it using at least the steps described below. These steps necessarily require contemporaneous access to the contents of the communications while they are in transit.

71.    First, the Third Parties must read the data in real time in order to *transform* it into a usable format for subsequent processing. Transforming, for example, may involve converting long html-encoded strings and decoding them to a format such as Unicode Transformation Format, which is more amenable to subsequent processing.

72.    Second, the Third Parties read the data in real time in order to *deduplicate* events transmitted through multiple channels. Most websites transmit the same user interaction twice: both directly from the user's device and separately through a server-to-server API, to ensure reliability.[25] Third Party platforms encourage this redundant configuration and automatically compare identifiers contained within the transmitted data—such as event identifiers and device identifiers—to determine whether multiple transmissions correspond to the same user action. This deduplication occurs as the communications are received, before they are stored.

73.    Third, the Third Parties read and analyze incoming communications in real time to *validate* and *filter* the data, including to detect invalid, malicious, or anomalous transmissions and to determine whether the data complies with internal processing rules. These determinations must be made immediately upon receipt of the communication in order for the Third Parties' systems to function.

---

[25] On information and belief, each of the Third Parties uses a server-to-server API to collect user data.

CLASS ACTION COMPLAINT

74. Fourth, the Third Parties perform real-time *analytics* on user communications to determine their meaning and significance. This processing is used to interpret the data, associate it with particular users or devices, and to determine what real-time events or actions should be taken in response, such as triggering advertising delivery, notifications, or other automated responses. This step typically involves applying artificial intelligence and machine learning algorithms to the data. These determinations occur while the data is in motion, prior to final storage.

75. To accomplish each of the functions described above, the Third Parties employ real-time stream processing platforms specifically designed to operate on data "in flight"—that is, after it is transmitted from a user's browser but before it is committed to the Third Parties' storage. Examples of such platforms include Apache Flink, Kafka, and Amazon Kinesis. Industry documentation confirms that these systems are designed to read, transform, analyze, and act upon data streams as they are received.

76. On information and belief, the other Third Parties also use ingest-phase processing platforms that perform real-time analytics and filtering on incoming data streams before storage.

77. Accordingly, the Third Parties' platforms do not operate as passive recipients that merely record user communications. Instead, they function as active interceptors that contemporaneously read and process the contents of user communications—including the Private Communications—by transforming, deduplicating, validating and filtering and analyzing in real time while those communications are in transit between the user's browser and Defendant's Website.

**E.      The Signaling and Addressing Information Intercepted by the Third Parties.**

67. The "signaling" and "addressing" information captured and recorded by the Third Parties includes TCP and/or UDP port numbers associated with outgoing communications initiated by Plaintiffs' and Class Members' browsers and devices. In the context of Internet Protocol (IP) networking, port numbers function as sub-addresses that direct traffic to specific software processes. By recording these port numbers, the Third Parties identify and distinguish

CLASS ACTION COMPLAINT

specific network connections and the communicating endpoints involved (e.g., a Plaintiffs' or Class Member's IP address and TCP/UDP source port communicating with a Third Party's destination IP address and destination port such as 443). These port numbers constitute addressing information associated with the communications initiated by Plaintiffs' and Class Members' browsers and devices and fall within the "instruments" and "facilities" contemplated by California Penal Code § 638.50(b).

68.    The "signaling" information also includes protocol-level metadata recorded by the Third Parties during connection establishment and session management, such as the initiation and acceptance of TCP connections and the TLS handshake and negotiation metadata used to establish HTTPS sessions. This signaling information is transmitted by Plaintiffs' and Class Members' devices to initiate, coordinate, and manage electronic communications with the Third Parties. Because this metadata enables management of the connection rather than the substance of the message, it constitutes record information regarding the characteristics of the communication, rather than communication content, and falls squarely within the statutory definition of a pen register.

69.    Additionally, the Third Parties record HTTP request header metadata, such as the "Host" header and connection-management headers (e.g., "Connection" in HTTP/1.1), which function as digital "dialing" information. Just as a traditional pen register records the number dialed to reach a destination, these headers identify the intended web origin (via "Host") and specify how the client requests the connection be handled for that request (e.g., whether to keep the connection open). This header information is transmitted as part of the Plaintiffs' and Website users' HTTP requests and, together with the destination network address and port, enables the receiving Third Party to identify and log the destination and handling characteristics of Plaintiffs' and Website users' communications, separate from any underlying user input or message content.

70.    Finally, the Third Parties' receiving infrastructure (e.g., servers, edge services, and/or load balancers) observes and records network-level and transport-level routing and addressing metadata associated with communications initiated by Plaintiffs' and Website users'

browsers and devices. This metadata includes destination IP addresses, port identifiers (such as 443 for HTTPS), and related connection and session attributes, including connection initiation and termination timestamps, connection duration, and identifiers such as the protocol used (TCP or UDP), the source IP address, the source port, the destination IP address, and the destination port. The Third Parties use this information in real time to identify and log the origin and destination endpoints of Plaintiffs' and Website users' electronic communications and the characteristics of those connections, separate from any substantive "message" or "contents" carried at the higher-level Application layer.

**F.      The Private Communications Collected are Valuable.**

71.      As part of its regular course of business, Defendant targets California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendant's and the Third Parties' profit, all of the Private Communications transferred by the cookies which Defendant causes to be placed on Plaintiffs' and other California Website users' devices without their knowledge or consent. Defendant knew the location of consumers like Plaintiffs and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

72.      The Private Communications tracked and collected through cookies on the Website are valuable to Defendant and the Third Parties. Defendant uses this data to measure and optimize marketing campaigns, evaluate website design and product placement, and target specific users or groups of users with advertising. For example, Defendant can identify California users who visit webpages related to particular wines and beverage products and then target those users with advertisements for related products both on the Website and across unrelated third-party websites.

73.      Data reflecting users' browsing activity allows Defendant to identify behavioral patterns, preferences, and interests relating to Defendant's products. At scale, this data enables Defendant to assess trends across its brands and within the broader wines and alcoholic beverage market. Defendant monetizes this data by leveraging it to increase user engagement, advertising effectiveness, and overall revenue.

CLASS ACTION COMPLAINT

74. The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[26] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

75. Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell them data or the consumer's willingness to pay to protect their information.

76. By falsely representing consumers' ability to decline or reject cookies and opt-out of the sale of personal data, and by aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to collect users' Private Communications, Defendant unjustly enriches itself at the expense of consumer privacy and autonomy. Defendant deprives consumers of the ability to decide whether, and on what terms, their data may be monetized.

## PLAINTIFFS' EXPERIENCES

**Plaintiff Jeffrey Kent**

77. Plaintiff Kent visited the Website to seek and obtain information about products featured on the Total Wine Website, while located in California, on one or more occasions during the last four years. In particular, Plaintiff Kent used the Website to research and compare alcoholic beverages, review product offerings and pricing, and evaluate products he was considering purchasing, including champagne, whiskey, and vodka products. Plaintiff Kent navigated the Website by browsing product categories, viewing product pages, and reviewing pricing and related product information.

78. Plaintiff Kent's visits to the Website were consistent with those of an ordinary user seeking information about the products Total Wine sells. Plaintiff Kent is not a consumer

---

[26] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

CLASS ACTION COMPLAINT

advocate, a "tester," or a compliance auditor who visited the Website to test or evaluate Defendant's privacy practices.

79. When Plaintiff Kent visited the Website, the Website immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which provided the option to select the "Reject All" button. Plaintiff Kent viewed Defendant's representation on the popup cookie consent banner that, rather than choosing to "Accept" cookies or otherwise manage the Website's "Cookie Settings," he could instead "Reject All" cookies.

80. Plaintiff Kent selected and clicked the "Reject All" button. Accordingly, Plaintiff Kent believed that selecting or clicking the "Reject All" button would allow him to opt out of, decline, and/or reject "All" cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of personal data to third-party marketing and advertising networks).

81. Plaintiff Kent gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies that shared his information with third parties while browsing the Website. In reliance on these representations and promises, only then did Plaintiff Kent continue browsing the Website.

82. Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for marketing and advertising, to be placed on Plaintiff Kent's device and/or transmitted to the Third Parties along with user data, without Plaintiff Kent's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Kent that he could reject the sale of his personal data, including the use and/or placement of all cookies and tracking technologies, or at least all marketing and advertising cookies, while he browsed the Website was false. Contrary to what Defendant made Plaintiff Kent believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

83. Then, as Plaintiff Kent continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff Kent's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant

- 30 -
CLASS ACTION COMPLAINT

nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing marketing and advertising from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Kent's Private Communications as Plaintiff Kent browsed the Website.

84.    Defendant's representations that Plaintiff Kent and users could "Reject All" cookies while they browsed the Website were untrue. Had Plaintiff Kent known this fact, he would not have used the Website. Moreover, Plaintiff Kent reviewed the popup cookie consent banner and preferences window prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all cookies, Plaintiff Kent would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Website differently.

85.    Plaintiff Kent continues to desire to browse content featured on the Website. Plaintiff Kent would like to browse websites that do not misrepresent that users can decline or reject "All" cookies and tracking technologies, including at least those marketing and advertising cookies associated with the sale of users' personal data. If the Website were programmed to honor users' requests to decline or reject all cookies and tracking technologies, including at least those marketing and advertising cookies that cause the sale of users' personal data, Plaintiff Kent would likely browse the Website again in the future, but will not do so until then. Plaintiff Kent regularly visits websites that feature content similar to that of the Website. Because Plaintiff Kent does not know how the Website is programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Website honors users' requests to decline or reject all cookies and tracking technologies, Plaintiff Kent will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to

whom. Plaintiff Kent is not a software developer and has not received training with respect to HTTP network calls.

**Plaintiff Robin Savage**

86.    Plaintiff Savage visited the Website to seek and obtain information about the products, promotions, and services featured on the Total Wine Website, while located in California, on one or more occasions during the last four years including in or around 2022 and November 2023. In particular, Plaintiff Savage visited the Website to review product offerings, sales, promotional specials, and other information available through the Website, and also reviewed information relating to potential employment opportunities. Plaintiff Savage navigated the Website by entering search terms, clicking links and browsing webpages of interest.

87.    Plaintiff Savage's visits to the Website were consistent with those of an ordinary user seeking information about the products Total Wine sells. Plaintiff Savage is not a consumer advocate, a "tester," or a compliance auditor who visited the Website to test or evaluate Defendant's privacy practices.

88.    When Plaintiff Savage visited the Website, the Website immediately detected that she was a visitor in California and presented her with Defendant's popup cookie consent banner, which provided the option to select the "Reject All" button. Plaintiff Savage viewed Defendant's representation on the popup cookie consent banner that, rather than choosing to "Accept" cookies or otherwise manage the Website's "Cookie Settings," she could instead "Reject All" cookies.

89.    Plaintiff Savage selected and clicked the "Reject All" button. Accordingly, Plaintiff Savage believed that selecting or clicking the "Reject All" button would allow her to opt out of, decline, and/or reject "All" cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of personal data to third-party marketing and advertising networks).

90.    Plaintiff Savage gave Defendant notice that she did not consent to the use or placement of cookies and tracking technologies that shared her information with third parties while browsing the Website. In reliance on these representations and promises, only then did Plaintiff Savage continue browsing the Website.

CLASS ACTION COMPLAINT

91.    Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for marketing and advertising, to be placed on Plaintiff Savage's device and/or transmitted to the Third Parties along with user data, without Plaintiff Savage's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Savage that she could reject the sale of her personal data, including the use and/or placement of all cookies and tracking technologies, or at least all marketing and advertising cookies, while she browsed the Website was false. Contrary to what Defendant made Plaintiff Savage believe, she did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with her user data; rather, Defendant had already caused that to happen.

92.    Then, as Plaintiff Savage continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff Savage's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing marketing and advertising from the Third Parties on her device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Savage's Private Communications as Plaintiff Savage browsed the Website.

93.    Defendant's representations that Plaintiff Savage and users could "Reject All" cookies while they browsed the Website were untrue. Had Plaintiff Savage known this fact, she would not have used the Website. Moreover, Plaintiff Savage reviewed the popup cookie consent banner and preferences window prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all cookies, Plaintiff Savage would have noticed it and would not have used the Website or, at a minimum, she would have interacted with the Website differently.

94.    Plaintiff Savage continues to desire to browse content featured on the Website. Plaintiff Savage would like to browse websites that do not misrepresent that users can decline or reject "All" cookies and tracking technologies, including at least those marketing and advertising

cookies associated with the sale of users' personal data. If the Website were programmed to honor users' requests to decline or reject all cookies and tracking technologies, including at least those marketing and advertising cookies that cause the sale of users' personal data, Plaintiff Savage would likely browse the Website again in the future, but will not do so until then. Plaintiff Savage regularly visits websites that feature content similar to that of the Website. Because Plaintiff Savage does not know how the Website is programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Website honors users' requests to decline or reject all cookies and tracking technologies, Plaintiff Savage will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Savage is not a software developer and has not received training with respect to HTTP network calls.

## CLASS ALLEGATIONS

95.     Plaintiffs bring this Class Action Complaint on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

> **Class**: All persons who browsed the Website in the State of California after rejecting cookies by clicking the "Reject All" button on the Website's popup cookie consent banner.

96.     This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

97.     **Numerosity:** Plaintiffs do not know the exact size of the Class, but they estimate

CLASS ACTION COMPLAINT

that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

98.    **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful conduct that led them to believe that Defendant would not cause third-party cookies to be placed on their browsers and devices and/or transmitted to third parties along with user data, after Class members chose to reject "All" cookies and tracking technologies on the Website, or at least those marketing and advertising cookies responsible for selling or sharing users' personal data, nor would Defendant permit third parties to track and collect Class members' Private Communications as Class members browsed the Website.

99.    The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a.    Whether Defendant's actions violate California laws invoked herein; and

b.    Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

100.    **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs, like the other Class members, visited the Website, chose to "Reject All" cookies, and had their confidential Private Communications intercepted by the Third Parties.

101.    **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of all Class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the Class. By prevailing on their claims, Plaintiffs will

CLASS ACTION COMPLAINT

establish Defendant's liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate their class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

102.    **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

**CAUSES OF ACTION**

**<u>First Cause of Action</u>: Invasion of Privacy**

103.    Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

104.    To plead an invasion of privacy claim, Plaintiffs must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiffs had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

105.    Defendant has intruded upon the following legally protected privacy interests of Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the

California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiffs' and Class members' Fourth Amendment right to privacy.

106. Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as Defendant affirmatively promised users they could "Reject All" cookies by clicking the button to do so, before proceeding to browse the Website. Plaintiffs and other Class members directed their electronic devices to access the Website and, when presented with the popup cookies consent banner on the Website, Plaintiffs and Class members rejected "All" cookies and reasonably expected that their declination or rejection of "All" cookies and tracking technologies would be honored. That is, they reasonably believed that Defendant would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Website. Plaintiffs and Class members also reasonably expected that, if they declined or rejected "All" such cookies and/or tracking technologies, Defendant would not permit the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Website.

107. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

108. Defendant, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy and without their consent, permits the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is

- 37 -

CLASS ACTION COMPLAINT

located in California. The data that Defendant allowed third parties to collect enables the Third Parties to (and they in fact do), *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiffs' and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

109. Defendant's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications) and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

110. Defendant's intrusion into Plaintiffs' privacy was also highly offensive to a reasonable person.

111. Defendant lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

112. Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

113. Plaintiffs and Class members seeks appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

CLASS ACTION COMPLAINT

114.    Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Second Cause of Action: Intrusion Upon Seclusion**

115.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

116.    To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiffs have a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

117.    By permitting third-party cookies to be stored on consumers' devices without consent, which caused the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendant's representations otherwise in the popup cookie consent banner, Defendant intentionally intruded upon the solitude or seclusion of Website users. Defendant effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

118.    The Third Parties' tracking and collecting of Plaintiffs' and Class member's Private Communications on the Website using third-party cookies that Defendant caused to be stored on users' devices—and to be transmitted to Third Parties—was not authorized by Plaintiffs and Class members, and, in fact, those Website users specifically chose to "Reject All" cookies.

119.    Plaintiffs and the Class members had an objectively reasonable expectation of privacy surrounding their Private Communications on the Website based on Defendant's

CLASS ACTION COMPLAINT

promise that users could "Reject All" cookies by clicking the button to do so, as well as state criminal and civil laws designed to protect individual privacy.

120. Defendant's intentional intrusion into Plaintiffs' and other users' Private Communications would be highly offensive to a reasonable person given that Defendant represented that Website users could "Reject All" cookies, when, in fact, Defendant caused third-party and other cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers rejected all such cookies. Indeed, Plaintiffs and Class members reasonably expected, based on Defendant's false representations, that when they rejected all cookies and tracking technologies, including at least those marketing and advertising cookies associated with the sale of users' personal data, Defendant would not cause such third-party cookies to be stored on their devices or permit the Third Parties to obtain their Private Communications on the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

121. Defendant's conduct was intentional and intruded on Plaintiffs' and users' Private Communications on the Website.

122. Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

123. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

124. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' declination or rejection of the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

CLASS ACTION COMPLAINT

**Third Cause of Action**: **Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)**

125.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

126.    California Penal Code § 631(a) provides, in pertinent part:

"Any person [i] who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or [ii] [who] in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [iii] who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or [iv] who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

127.    Defendant is a "person" within the meaning of California Penal Code § 631.

128.    The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

129.    Each of the Third Parties is a separate legal entity that offers a software-as-a-service and not merely a passive device. Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiffs and Class members, on the one hand, and Defendant, on the other.

130.    Under § 631(a), Defendant must show it had the consent of all parties to a communication.

131.    At all relevant times, the Website caused Plaintiffs and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device

- 41 -

CLASS ACTION COMPLAINT

information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiffs' and Class members' consent. By configuring the Website in this manner, Defendant willfully aided, agreed with, employed, permitted, or otherwise caused the Third Parties to wiretap Plaintiffs and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

132.    At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

133.    The Private Communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, that the Third Parties automatically intercepted directly communicates the Website user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

134.    At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

135.    Plaintiffs and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiffs and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept,

- 42 -

read, learn, record, collect, and use Plaintiffs' and Class members' electronic communications by choosing to "Reject All" cookies by clicking the button to do so on the popup cookie consent banner.

136. The wiretapping of Plaintiffs and Class members occurred in California, where Plaintiffs and Class members accessed the Website and where the Third Parties—as caused by Defendant—routed Plaintiffs' and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiffs' California-located device. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

137. Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of their right to privacy, (ii) loss of value in their Private Communications, (iii) damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

138. Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendant's violations of CIPA § 631(a), as well as injunctive relief.

139. Unless enjoined, Defendant will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiffs and Class members' electronic Private Communications with Defendant. Plaintiffs, Class members, and the general public continue to be at risk because Plaintiffs, Class members, and the general public frequently use the internet to search for information and content related to wines and alcoholic beverages. Plaintiffs, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiffs, Class

- 43 -

CLASS ACTION COMPLAINT

members, and the general public have no practical way to know if their request to reject "All" cookies and tracking technologies will be honored and/or whether Defendant will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Further, Defendant has already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant and will continue to do so unless and until enjoined.

**Fourth Cause of Action**: **Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51)**

140.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

141.    The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

142.    California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

143.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

144.    The Third Parties' cookies and the corresponding software code installed by Defendant on its Website are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiffs' and the Class's computers or devices. Cal. Penal Code § 638.50(b).

- 44 -
CLASS ACTION COMPLAINT

145. At all relevant times, Defendant caused pen registers (e.g., the Third Party software code and cookies) to be placed on Plaintiffs' and Class members' browsers and devices. This software code established and maintained network connections between the users' devices and the Third Parties, and also caused cookies, user data and metadata, and addressing and networking information (including, without limitation, IP addresses, port numbers, protocol-level metadata, HTTP request header metadata, and and user-agent information), to be transmitted to the Third Parties.

146. Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiffs' and the Class members' electronic communications with the Website.

147. Plaintiffs and Class members did not provide their prior consent to Defendant's use of third-party cookies and the corresponding software. On the contrary, Plaintiffs and the Class members informed Defendant that they did not consent to the Website's use of third-party cookies by clicking the "Reject All" button on the popup cookie consent banner.

148. Defendant did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiffs' and Class member's IP addresses and user-agent information.

149. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

150. Pursuant to Penal Code § 637.2(a)(1), Plaintiffs and Class members are also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

**Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation**

151. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

152. Defendant fraudulently and deceptively informed Plaintiffs and Class members that they could "Reject All" cookies by clicking the button to do so on the popup cookie consent banner.

153. However, despite Defendant's representations otherwise, Defendant caused third-party cookies and software code to be stored on consumers' devices, and to be transmitted

- 45 -

CLASS ACTION COMPLAINT

to the Third Parties alongside Private Communications, even after users clicked the "Reject All" button on the popup cookie consent banner. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' Private Communications, even when consumers had previously chosen to reject "All" such cookies.

154. Defendant affirmatively chose to deploy a cookie consent banner governing the collection, sharing, and use of users' Private Communications on the Website.

155. By implementing the cookie banner, Defendant undertook responsibility for ensuring that the banner accurately communicated users' privacy choices and properly effectuated those choices.

156. Defendant and/or its agents configured and managed which technologies loaded and transmitted data before and after a user disabled third party cookies, including through consent management settings and/or platforms, tag-management rules, and related implementation choices under Defendant's control. On information and belief, Defendant operated, controlled, configured, approved, or maintained settings that permitted the Third Parties' tracking technologies to continue collecting users' Private Communications even after users selected options indicating their choice to decline and/or reject cookies and opt out of the collection, use, sale, and/or sharing of their Private Communications.

157. Industry documentation for the consent management platforms and Third Parties' technologies used on the Websites explains that website operators, i.e., Defendant, must affirmatively configure consent settings and tag behavior to prevent tracking technologies from firing after users reject cookies. On information and belief, Defendant received, reviewed, or had access to such implementation guidance in deploying the challenged technologies on the Websites. On information and belief, Defendant had the ability during the relevant time period to audit, test, configure, disable, or modify, the cookie consent banner, consent-management functionality, and Third-Party tracking technologies operating on the Websites. Defendant had information available to it demonstrating that users' purported opt-out selections were not being

CLASS ACTION COMPLAINT

honored and that users' Private Communications continued to be collected and transmitted to the Third Parties notwithstanding Defendant's contrary representations.

158.    Defendant also used the Third Parties' analytics, advertising, and reporting dashboards to monitor Website traffic, user behavior, advertising performance, and related engagement metrics generated through the challenged cookie and tracking technologies. Through these dashboards and related reporting tools, Defendant had access to information reflecting that user data continued to be transmitted to and processed by the Third Parties notwithstanding users' purported opt-out selections. Defendant routinely reviewed, monitored, and relied upon data generated through the Third Parties' resources for advertising, analytics, personalization, attribution, and/or website performance purposes.

159.    Industry standards, privacy frameworks, and applicable statutes and regulations, including California's California Consumer Privacy Act and related regulations, require website operators deploying cookie consent banners to ensure that consent mechanisms function properly and accurately record and enforce user choices. *See*, *e.g*., California Consumer Privacy Rights Act § 7025(c) (enumerating requirements for businesses that receive an "opt out preference signal."); *id*. § 7101 (business record keeping requirements regarding opt out requests).

160.    On information and belief, Defendant either knew its representations regarding users' ability to reject cookies were false, lacked any reasonable basis for believing those representations were, or made those representations carelessly and recklessly despite information available to Defendant demonstrating that users' data continued to be collected and transmitted to the Third Parties after users attempted to opt out.

161.    These misrepresentations and omissions were known exclusively to, and actively concealed by Defendant, not reasonably known to Plaintiffs and Class members, and material at the time they were made. Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs and Class members as to whether to use the Website. In misleading Plaintiffs and Class members and not so informing them, Defendant breached its duty to Plaintiffs and Class members. Defendant also gained financially from, and as a result of, its breach.

- 47 -

CLASS ACTION COMPLAINT

162. Plaintiffs and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions.

163. Plaintiffs and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendant's unfair, deceptive, and/or unlawful practices, including the unauthorized interception of their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiffs and Class members have also suffered harm in the form of diminution of the value of their private and personally identifiable information and communications.

164. Defendant's actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

165. Defendant's representation that consumers could "Reject All" cookies if they clicked the button to do so was untrue. Again, had Plaintiffs and Class members known these facts, they would not have used the Website. Moreover, Plaintiffs and Class members reviewed the popup cookie consent banner and cookies preferences window prior to their interactions with the Website. Had Defendant disclosed that it caused third-party cookies to be stored on Website visitors' devices that are related to marketing and advertising and/or share information with or sell user personal data to third parties, even after they choose to opt out of such sales by choosing to "Reject All" cookies, Plaintiffs and Class members would have noticed it and would not have interacted with the Website.

166. By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs and Class members to alter their positions to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiffs and Class members to, without limitation, use the Website under the mistaken belief that Defendant would not permit third parties to obtain users' Private Communications when consumers chose to

- 48 -

CLASS ACTION COMPLAINT

"Reject All" cookies. As a result, Plaintiffs and the Class provided more personal data than they would have otherwise.

167. Plaintiffs and Class members justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant's conduct.

168. As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiffs and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

169. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Sixth Cause of Action: Unjust Enrichment**

170. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

171. Defendant created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

172. Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could "Reject All" cookies, and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members rejected "All" such cookies.

173. Plaintiffs and Class members' Private Communications, including their personal data, have conferred an economic benefit on Defendant.

- 49 -

CLASS ACTION COMPLAINT

174. Defendant has been unjustly enriched at the expense of Plaintiffs and Class members, and Defendant have unjustly retained the benefits of its unlawful and wrongful conduct.

175. Defendant appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendant at their detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of Plaintiffs and Class members.

176. It would be unjust for Defendant to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

177. There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

178. Plaintiffs and Class members are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position they occupied prior to having their Private Communications tracked and collected by the Third Parties.

179. Plaintiffs plead this claim separately, as well as in the alternative, to their other claims, as without such claims Plaintiffs would have no adequate legal remedy.

## **PRAYER FOR RELIEF**

**WHEREFORE**, reserving all rights, Plaintiffs, on behalf of themselves and the Class members, respectfully requests judgment against Defendant as follows:

A.     Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B.     An award of compensatory damages, including statutory damages where available, to Plaintiffs and Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, including both pre- and post-judgment interest thereon;

C.     An award of punitive damages;

D.     An award of nominal damages;

- 50 -
CLASS ACTION COMPLAINT

E.  An order for full restitution;

F.  An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

G.  An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H.  For reasonable attorneys' fees and the costs of suit incurred; and

I.  For such further relief as may be just and proper.

Dated: June 19, 2026

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier*
Seth A. Safier (State Bar No. 197427)
 seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
 marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
 todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT

# EXHIBIT A

**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
  kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Claimant*

## AMERICAN ARBITRATION ASSOCIATION

## SAN FRANCISCO REGIONAL OFFICE

| | |
|---|---|
| ROBIN SAVAGE,<br><br>                     Claimant,<br><br>       v.<br><br>RETAIL SERVICES & SYSTEMS, INC.,<br><br>                     Respondent. | Arbitration Case No.<br><br>**COMPLAINT AND DEMAND FOR ARBITRATION** |

Claimant Robin Savage ("Claimant") brings this action against Retail Services & Systems, Inc. ("Respondent" or "Total Wine"). Claimant's allegations against Total Wine are based upon information and belief and upon investigation of Claimant's counsel, except for allegations specifically pertaining to Claimant, which are based upon Claimant's personal knowledge. Claimant files this Complaint and Arbitration Demand without waiver of any right or argument, specifically, and without limitation, that she did not assent to Total Wine's website's Terms & Conditions, including the arbitration agreement contained therein, and/or that the purported arbitration agreement is unlawful and/or unenforceable.

## **INTRODUCTION**

1.      This Complaint and Arbitration Demand concerns one issue: whether a valid and enforceable arbitration agreement was formed between the parties to cover a separate dispute about Respondent's internet cookie practices that is not part of this Complaint nor at issue in this proceeding. For purposes of context, that underlying dispute relates to Claimant's visit to

Respondent's website (www.totalwine.com, the "Website"), where despite Claimant's agreement with Respondent that it would not place tracking cookies on her device, Respondent proceeded to do so anyway. As is relevant to the instant dispute, the Website also contains Terms & Conditions ("T&C" or "Terms") with an arbitration provision purporting to require "any and all disputes and claims" between website visitors and Respondent to be resolved by binding arbitration. Claimant contends that no agreement to arbitrate was ever formed. Accordingly, she filed this arbitration demand to seek a declaration from the arbitrator that her underlying cookie dispute with Respondent is not subject to arbitration.

2.      The Website's T&C are available on the Website but accessible only via an inconspicuous link displayed in small font at the bottom of the Website after all the main content. Moreover, Respondent does not require Website users to read or agree to the Terms before browsing the Website.

3.      When Claimant visited the Website, she did not see or otherwise assent to the T&C before choosing to "Reject All" cookies and browse the website. Nor could she have done so. When users visit the Website, Respondent immediately displays a cookie pop up banner that *obscures* the Website's main content until users make a cookies selection on the banner. Because it is impossible for a Website user to view the link to the T&C, much less the T&C themselves, without first entering into an agreement with Respondent to accept or refuse cookies, Claimant could not—and did not—assent to the T&C. Accordingly, Claimant made no agreement to arbitrate her underlying cookie dispute.

### BACKGROUND ON THE UNDERLYING COOKIE DISPUTE

4.      This underlying dispute in this matter concerns an egregious privacy violation and total breach of consumer trust in blatant violation of California law. The Website is configured to use a multitude of cookies to enable third parties to track users' activity and communications on the Website.

COMPLAINT AND DEMAND FOR ARBITRATION

5.      However, at least until placed on notice,[1] the Website presented all visitors immediately with a cookie pop-up banner indicating that, rather than accepting all cookies, users can "Reject All."

**Privacy Notice**                    **Cookie Settings**

Total Wine & More has updated its **Privacy Policy**. Please review, as the changes may impact your privacy rights.

This site uses cookies to provide you with a great experience. Please review our **Cookie Policy**.

By clicking "Accept" you agree to the storing of cookies on your device. To update, click "Cookie Settings."

**Reject All**

**Accept**

(Screenshot Total Wine's Website cookie popup banner.)

6.      Thousands of visitors to the Website, including Claimant, did just that—they clicked the "Reject All" button to indicate their choice/agreement to reject all cookies, inclusive of those that enable the sale and sharing of their personal data, and then proceeded to browse the Website.

7.      Unbeknownst to Claimant and other users, however, Respondent nonetheless caused cookies—both from Respondent and third parties with notorious privacy records, including Adobe Audience Manager, Adobe Marketing Cloud, Microsoft/Bing, among others— to be stored on the devices and browsers of Claimant and other users despite their rejection of all cookies. As a result, Respondent caused the sharing, and ultimately the sale, of broad swaths of personal data about Claimant, and other users, to undisclosed third parties, contrary to Respondent's representations and Claimant's express directions. Respondent brings this arbitration solely to establish that the separate cookie dispute is not arbitrable.

## PARTIES

8.      Claimant Robin Savage is, and was at all relevant times, an individual and resident of California. Claimant intends to remain in California and makes her permanent home there.

---

[1] On or about October 14, 2023, Respondent was notified of its ongoing invasions of privacy and alleged violations of law, as described herein, as required under California's Consumers Legal Remedies Act, Cal. Civil Code §§ 1750 *et seq*., and Consumer Privacy Rights Act, Cal. Bus. & Prof. Code §§ 1798, *et seq*.

COMPLAINT AND DEMAND FOR ARBITRATION

9.      Respondent Retail Services & Systems, Inc. d/b/a Total Wine & More is a California corporation with its headquarters and principal place of business in Bethesda, Maryland.

## SUBSTANTIVE ALLEGATIONS

### A.      Respondent's Unenforceable Browsewrap Agreement.

10.      Respondent's Website includes T&C that purports to govern the use of the Website. *See* T&C.

11.       The T&C purports to require Website users to arbitrate all disputes with Respondent with the AAA. *See* T&C "Arbitration Agreement" ("You agree that the sole and exclusive forum and remedy for any and all disputes and claims that cannot be resolved informally and that relate in any way to or arise out of your use of any of the Sites and these Terms shall be final and binding arbitration. . . . Arbitration under this Agreement shall be conducted by the American Arbitration Association ('AAA')").

12.      Claimant, however, did not assent to the T&C or the arbitration provision contained therein. An internet contract is valid only if the user takes some action to unambiguously manifest assent to the contract after the website has placed the user on actual notice of the terms of that contract or has put a reasonably prudent user on inquiry notice of those terms. Claimant never saw the T&C, or even the hyperlink to "Terms & Conditions," and thus had no actual notice that her continued browsing of the Website would be subject to an arbitration agreement.

13.      Nor did the Website place Claimant on inquiry notice of the T&C because it failed to provide reasonably conspicuous notice of the T&C. Moreover, Claimant took no action, such as clicking a button or checking a box, that unambiguously manifested her assent to the T&C. The Terms on the Website are no more than an unenforceable browsewrap agreement.

14.    When users visited the Website, Respondent immediately displayed to them a cookie pop up banner which prompted users to either "Reject All" or "Accept" cookies. The cookies pop up banner remains displayed, obscuring the Website's main content, until users make a selection on the banner. The cookies pop up banner made no mention of the Website's T&C, contained no link to the T&C, and did not require the user to manifest assent to the Terms.



(Screenshot of Total Wine's Website showing cookie banner obscuring main content.)

15.    The only link to the T&C appeared in small font (identical to the surrounding font) at the bottom of the Website. Website users were unable to click the link to view Respondent's T&C before selecting to either "Reject All" or "Accept" cookies in the banner because the popup banner itself obscured the Website and preventing users from accessing any

COMPLAINT AND DEMAND FOR ARBITRATION

of the content on the main Website, including the link to the T&C. Therefore, even assuming *arguendo* that Website users scrolled down to the very bottom of the Website before making their selection on the cookies popup banner, it was **impossible** for users to read and assent to T&C prior to agreeing to "Reject All" or "Accept" cookies.

16.     Even setting aside the fact that the cookie pop-up blocks any ability to view the T&C, the link to the T&C itself at the bottom of the Website is not conspicuous. It is not, for example, in a different color, font or size from the surrounding text. Nor is it highlighted or emboldened relative to its surrounding text. Instead, it is very small and much less conspicuous than the images and text elsewhere on the Website. Moreover, it is not available on the Website when a user first visits; rather, they must scroll down to find it with no forewarning of being bound by the Terms.



(Screenshot of Total Wine's Website showing link to Terms & Conditions at the very bottom of Website.)

17.     Respondent never required Claimant to manifest consent to the T&C; it purports to bind users to the T&C simply by their continued use of the Website, which is legally insufficient even if the notice had been conspicuous.

**B.     Claimant's Experiences**

18.     During the last two years, Claimant visited the Total Wine Website to browse products.

19.     When Claimant visited the Total Wine Website, the Website immediately presented her with Respondent's cookie pop up banner as it appeared at the time.

COMPLAINT AND DEMAND FOR ARBITRATION

20.     Consistent with her typical practice in rejecting cookies and/or the sale of her personal data, Claimant clicked "Reject All," giving Respondent notice that she did not consent to the use or placement of third-party cookies. In reliance on these representations and promises, only then did Claimant continue browsing the Website.

21.     Claimant did not see the T&C link—or the actual T&C—on the Website prior to rejecting all cookies, or at any point thereafter. Moreover, Claimant could not have seen the link to Respondent's T&C prior to clicking "Reject All" because—in addition to being hidden in small font at the very bottom of the Website—the cookies pop up banner obscured the only link to the T&C on the Website. The cookies popup banner did not disappear until after Claimant made her cookies choices.

## CAUSE OF ACTION

**Declaratory Judgment that the Underlying Dispute is Not Subject to Arbitration**

22.     Claimant realleges and incorporates the paragraphs of this Complaint as if set forth herein.

23.     The Total Wine Website's T&C purports to require arbitration of any and all disputes and to waive users' rights to bring a legal action, including a class action, in court. In particular, the T&C states the following:

> **Arbitration Agreement** . . . You agree that the sole and exclusive forum and remedy for any and all disputes and claims that cannot be resolved informally and that relate in any way to or arise out of your use of any of the Sites and these Terms shall be final and binding arbitration, except to the extent that you have in any manner infringed upon or violated or threatened to infringe upon or violate any of the Total Wine Entities' or any third party patent, copyright, trademark, trade secret, privacy or publicity rights, in which case you acknowledge that there is no adequate remedy at law and that injunctive or other appropriate relief may be sought by the Total Wine Entities and/or the applicable third party(ies) either in court or from an arbitrator. You and we acknowledge that the Agreement affects interstate commerce and that the Federal Arbitration Act and federal arbitration law apply to arbitrations under the Agreement (despite any other choice of law provision).
>
> …
>
> Arbitration under this Agreement shall be conducted by the American Arbitration Association ("AAA"). The arbitration shall be administered by AAA pursuant to

- 7 -
COMPLAINT AND DEMAND FOR ARBITRATION

its Consumer Arbitration Rules. If the arbitration results in an award, then judgment on the award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. You and any of the Total Wine Entities, as applicable, agree to pay our own fees, costs, and expenses, including those for any attorneys, experts, and witnesses. You agree that any claim for or award of attorneys' fees, including such claim or award pursuant of Chapter 38 of Texas Civil Practice and Remedies Code, is waived. An arbitrator may award on an individual basis any relief. As a limited exception to the agreement to arbitrate, you and we agree that you may take claims to small claims court, if your claims qualify for hearing by such court.

To the fullest extent permitted by applicable law, NO ARBITRATION OR OTHER CLAIM UNDER THIS AGREEMENT SHALL BE JOINED TO ANY OTHER ARBITRATION OR CLAIM, INCLUDING ANY ARBITRATION OR CLAIM INVOLVING ANY OTHER CURRENT OR FORMER VISITOR OF THE SITES, AND NO CLASS ARBITRATION PROCEEDINGS OR MASS ACTIONS SHALL BE PERMITTED. "Mass Action" means a situation in which a party is represented by a law firm or other representative, or a collection of law firms or other representatives, that has initiated more than fifty (50) arbitration Demands with common questions of law or fact against Total Wine within 180 days of initiating your arbitration Demand. In the event that this CLASS ACTION OR MASS ACTION WAIVER is deemed unenforceable, then any putative class action may only proceed in a court of competent jurisdiction and not in arbitration.

WE BOTH AGREE THAT, WHETHER ANY CLAIM IS IN ARBITRATION OR IN COURT, YOU AND TOTAL WINE BOTH WAIVE ANY RIGHT TO A JURY TRIAL INVOLVING ANY CLAIMS OR DISPUTES BETWEEN US.

T&C.

24.    Claimant did not view, and did not have actual notice of, Respondent's T&C, including the arbitration provision contained therein.

25.    The link to the T&C was inconspicuous and failed to provide reasonably prudent users such as Claimant with actual notice that her continued use of the Website would subject her to the T&C.

26.    It was impossible for Claimant to view the hyperlink to the T&C and/or review the Terms prior to rejecting all cookies because the cookies pop up banner obscured the hyperlink to the T&C and prevented Claimant from clicking on content on the Website as described above.

27.    Respondent did not require users such as Claimant to manifest their unambiguous assent to the T&C by clicking a button or checking a box.

- 8 -

COMPLAINT AND DEMAND FOR ARBITRATION

28. Claimant, therefore, had no notice, constructive or otherwise, of the T&C and never assented to them.

29. Because Claimant did not assent to the Terms, Claimant is entitled to, and seeks, a declaration that the arbitration provision and class action waiver contained in the T&C are unenforceable and that the underlying dispute described herein is not subject to arbitration.

## PRAYER FOR RELIEF

**WHEREFORE**, reserving all rights, Claimant respectfully requests judgment against Respondent as follows:

30. An order declaring that Claimant did not assent to Respondent's T&C and that the underlying dispute described herein is not subject to arbitration;

31. For reasonable attorneys' fees and the costs incurred; and

32. For such further relief as may be just and proper.

Dated: January 13, 2025

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier*
Seth A. Safier (State Bar No. 197427)
 seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
 marie@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
 kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Claimant*

COMPLAINT AND DEMAND FOR ARBITRATION

# EXHIBIT B

**AMERICAN ARBITRATION ASSOCIATION – CONSUMER ARBITRATION RULES**

**DECISION RE: ARBITRABIITY**

AAA Case Number: 01-25-0000-1611                    Date: March 9, 2026

Robin Savage
-vs-
Retail Services & Systems, Inc.

## INTRODUCTION

1. Before the arbitrator now is Claimant, Robin Savage's Motion Regarding Non-Arbitrability (hereafter, "Motion") by which Claimant requests that "The Arbitrator should now find no agreement to arbitrate and grant Claimant leave to seek fees and costs." (Motion at 2:19-20). Based upon the Motion, Respondent Retail Services & Systems, Inc.'s Response Brief Regarding Arbitrability (hereafter, "Response"), arguments of counsel, the files and records of this case submitted to AAA, and applicable law, no decision is made on the Motion, as this Arbitration is STAYED in order to give the parties an opportunity to seek a judicial determination whether an arbitration agreement was formed between the parties.

## FACTUAL SUMMARY

2. On February 12, 2016, Claimant created an on-line account through Respondent's website, which incorporated Respondent's June, 2015 terms and conditions. Those terms and conditions included agreements to: (a) Respondent's Privacy Policy; (b) Maryland jurisdiction; (c) Maryland law; and (d) Be bound by Respondent's Terms of Service (hereafter, "Terms" or "T&C") if Claimant used Respondent's website (Response at pp.3:20-4:1;Resp.'s Exh. B: depiction of Terms at the time Claimant created her online account & Respondent's Exhibit C: T&C as of 2/12/16).

3. The February12, 2016 Terms did not contain an arbitration agreement. In 2020, Respondent updated its website's Terms to include an arbitration agreement. (Response at 5:2; Resp.'s Exh. E:2020 T&C).

4. In October, 2022, Respondent updated its website again to include a provision reserving the right to change its Terms, modified the arbitration provision by adding a class action waiver, and added the provisions: "[b]y continuing to use the Site after we post any such changes or notify you of any material changes, you accept the Terms & Conditions as modified." (Response at 5:17-19; Resp.'s Exh. F at 1: T&C as of Nov. 2023).

5. "At least since 2022," Respondent's website added a "cookie banner" that gave visitors a choice to click on links to the website's: (a) Privacy Policy; (b) Cookie settings to deactivate certain cookies; (c) "Reject All" option; and (d) "Accept all" option (Response at 6:22; Exhibit A to Safier's Declaration: Representative "Cookie Banner"). A "Cookie" is a small text file added for functionality. Some cookies, for example, allow visitors to add products to the online shopping cart, etc., while others can add links to other websites. (Response at 4:23)

1

6.  In November, 2023, Claimant visited Respondent's website, which at the time included Respondent's October, 2022 Terms.  Claimant alleges that she clicked on "Reject All" and did not see any references to the website's Terms.  Claimant alleges that the only way to see the terms and conditions was to scroll to the bottom of the webpage, where the terms and conditions were referenced in "small, inconspicuous font." (Motion at 3:15-17; Safier Decl. at ¶3; Safier Exh. B: Screenshot of bottom portion of Respondent's main webpage where a link to its T&C is placed, substantially similar to main webpage in or around November, 2023 when Claimant visited Website).  She further alleges that the terms and conditions could be blocked by a pop-up banner (Motion at 4:9-13;Safier Exh. C: Screenshot of main webpage content blocked by a Cookie Banner).  Claimant alleges that she just thought she had agreed that she would not be tracked, and that she had not agreed to all of Respondent's terms and conditions (Motion at 5:3-4: Savage Decl. at ¶7)

7.  On May 19, 2024, Respondent updated its website again; Respondent sent an email to customers, including to Claimant, announcing changes to its dispute resolution procedures, including a mandatory arbitration provision and waiver of jury trials (Response at 6:5-10; Vorcheimer Decl. at ¶14-15; Resp. Exh. H:5/19/24 Body of Email to Customers)

8.  On November 1, 2024, Respondent updated its website's Terms again (Response at 6:13-18; Vorcheimer Decl. at ¶16). On November 4, 2024, Respondent sent an email to its customers, including to Claimant at the email address: robinsavage06@gmail.com.  The email notified customers of its November 1, 2024 Terms update and provided a hyperlink to the November 2024 Terms.  (Response at 6:14-18; Vorcheimer Decl. at ¶16; Vorcheimer Exh. J:11//4/24 EMail to Customers).

9.  On January 13, 2025, Claimant initiated this Arbitration by filing a Demand for Arbitration with AAA, seeking "injunctive relief; attorneys' fees; declaratory relief." (1/13/2025 Demand for Arbitration – Consumer Arbitration Rules).   Her Demand identified Respondent's February 2024 Terms as the document containing the applicable arbitration agreement.

10. On January 13, 2025, Claimant also filed with AAA a Complaint and Demand for Arbitration that states:

    > Claimant files this Complaint and Arbitration Demand without waiver of any right or argument, specifically, and without limitation, that she did not assent to Total Wine's website's Terms & Conditions, including the arbitration agreement contained therein, and/or that the purported arbitration agreement is unlawful and/or unenforceable.

    > (1/13/25 Complaint & Demand for Arbitration at 1:19-23).

11. Claimant's Complaint and Demand for Arbitration contain a Prayer for Relief seeking judgment as follows:

    (a) An order declaring that Claimant did not assent to Respondent's T&C and that the underlying dispute described herein is not subject to arbitration (1/13/25 Complaint & Demand for Arbitration at p. 9, ¶30);
    (b) Reasonable attorney's fees (Id. at ¶31); and
    (c) Such further relief as may be just and proper (Id. at ¶32).

2

## CLAIMANT'S ARGUMENTS RE ARBITRABILITY

12. In her Motion, Claimant argues that:

(a) California law applies to the determination whether a valid arbitration agreement exists (Motion at p.6);
(b) Respondent and Claimant never formed an agreement to arbitrate (Id. at p. 7);
(c) Respondent's terms and conditions are not an enforceable clickwrap, scrollwrap or sign-in agreement (Id. at p.8);
(d) Respondent's terms and conditions are an unenforceable browsewrap agreement (Id.) and
(e ) Respondent's website otherwise fails the inquiry notice standard (Id. at p.10).

## RESPONDENT'S ARGUMENTS RE ARBITRABILITY

13. In its Response, Respondent argues that:

(a) "Claimant agreed to arbitration because she was on actual notice of and agreed to be bound by the arbitration clause" (Response at p.9);
(b) "Clamant agreed to arbitration because she was on constructive notice of the terms through the cookie banner and terms" (Id. at p. 10);
(c) "Clamant agreed to arbitration because she asserted an agreement to arbitrate and voluntarily initiated this arbitration" by (i) representing an agreement to arbitrate; and (ii) voluntarily invoking and embracing AAA's jurisdiction (Id. at pp.13-14);
(d) "Claimant waived an objection arbitration by materially participating in the arbitration" (Id. at p.16); and
(e) "Claimant waived any objection to arbitration by failing to seek court relief and cannot invoke arbitration for the sole purpose of contesting it." (Id. at p.18)

## DISCUSSION

14. There is a threshold issue whether a court or arbitrator has the authority to decide whether an arbitration agreement is in effect. The applicable law is either the Federal Arbitration Act or Maryland Law, though Claimant contends that California Law applies.  Respondent relies upon its October 2022 and 2020 Terms, which provide, in relevant part:

> To the extent that the Federal Arbitration Act and federal arbitration law do not supply substantive law necessary for the resolution of any disputes or claims, the laws of the State of Maryland shall apply.  To the extent that the parties litigate any part of any dispute or claim in court, including, without limitation, obtaining provisional remedies in aid of arbitration, confirmation of the award, and judgment enforcement, the laws of the State of Maryland shall apply.
>
> Response at 5:25-6: 5

15.  Under either the FAA, Maryland Law, or California Law, the question of whether an arbitration agreement was formed is different from whether it is enforceable. *Bailey v. Mercury Financial, LLC* 694 F.Supp.3d 613 (D. Maryland 2023).  In *Bailey*, plaintiffs in a putative class action sued

3

the defendant subprime lender for issuing loans without proper licensing. The Defendant moved to compel arbitration based upon an arbitration clause contained in its Cardholder Agreement. The District Court held that, as a threshold matter under the FAA, a court, not an arbitrator, has jurisdiction to decide whether an arbitration agreement was formed:

> While a challenge to the validity of a contract presumes that a contract has already been formed but should not be enforced, a challenge to the validity of an arbitration agreement contends that a contract to arbitrate was never formed. *See Johnson v. Cont'l Fin. Co., LLC, No. 8:22-CV-02001-PX, 690 F.Supp.3d 520, 526 (D. Md. Sept. 7, 2023)* (citing *Buckeye, 546 U.S. at 443, 444 n.1, 126 S.Ct. 1204; Granite Rock, 561 U.S. at 300, 130 S.Ct. 2847; Prima Paint, 388 U.S. at 399, 87 S.Ct. 1801*). Section 4 of the FAA requires that the district court, rather than an arbitrator, decide whether the parties have formed an arbitration agreement. *Berkeley, 944 F.3d 225, 234 (4th Cir. 2019)*.
>
> Defendant erroneously conflates the concepts of contract *validity* and contract *formation*. Plaintiff argues that no contract to arbitrate this dispute exists, not that an arbitration contract exists but is unenforceable due to defects in the underlying contract. (ECF No. 11 at 24). Regardless of whether Plaintiff challenges the formation of the arbitration agreement or the broader Agreement, the court should resolve this dispute. *See* 9 U.S.C. § 4; *Johnson, 690 F.Supp.3d at 526* (holding that because the plaintiffs alleged that no arbitration agreement exists, "[t]his challenge plainly stays with the Court, regardless of whether Plaintiffs mount a direct challenge solely to the formation of the Arbitration Provision, or a broader attack on the formation of the Cardholder Agreement within which the Arbitration Provision sits."). (emphasis added)
> Id. at 621

16. The *Bailey* court applied Maryland Law to the issue whether the arbitration agreement was enforceable:

> Maryland law requires an arbitration agreement to be a valid contract, which must be supported by consideration in the form of a binding obligation. *Hill, 412 F.3d at 543* (citing *Cheek v. United Healthcare of Mid-Atl., Inc., 378 Md. 139, 835 A.2d 656, 661*). An examination of whether an arbitration agreement is a valid contract is limited to the language of the arbitration agreement. *See id.* (citing *Cheek, 835 A.2d at 664-65*). Although an arbitration provision is severable from the underlying contract, a court must read the "construe the contract as a whole" to give effect to all the provisions constituting an arbitration agreement. *See Coady, 32 F.4th at 291* (quoting *Schneider Elec. Bldgs. Critical Sys., Inc. v. W. Sur. Co., 454 Md. 698, 165 A.3d 485, 490 (2017)*).
> Id. at 622

17. In the present case, even the enforceability of the choice of law provision in the Respondent's Terms is open to question because the choice of law provisions are contained in the same Terms as the arbitration provision. In *Bailey*, the Court applied Maryland choice of law rules, not the contractual choice of law provision:

> Third, Defendant argues that pursuant to the Cardholder Agreement's choice-of-law provision, South Dakota law governs this dispute. (ECF No. 7-1 at 13). Plaintiff contends that choice-of-law rules prescribe application of Maryland law. (ECF No. 11 at 21). State-law principles on contract formation, rather than a choice-of-law provision, govern challenges to an arbitration

4

agreement's existence, *Noohi*, 708 F.3d at 607 (quoting *Hill v. Peoplesoft USA, Inc.*, 412 F.3d 540, 543 (4th Cir. 2005)), because application of a choice-of-law provision presupposes that the parties have formed a binding arbitration agreement, *Johnson*, 690 F.Supp.3d at 525 (citing *James v. Synovus Bank*, No. TDC-19-1137, 2020 WL 1479115, at *2 (D. Md. Mar. 26, 2020); *Archer W. Contractors, LLC v. Synalloy Fabrication, LLC*, No. CCB-14-3031, 2016 WL 930965, at *4 (D. Md. Mar. 11, 2016)) ("Although generally, the Court must honor the parties' agreement to apply selected substantive state law, this presupposes that the agreement is binding in the first instance. But until the Court determines whether the Arbitration Provision was ever formed, it cannot enforce any of its terms, including a choice-of-law provision.").

Accordingly, Maryland choice-of-law principles determine which state's contract law applies here. *See Francis v. Allstate Ins. Co.*, 709 F.3d 362, 369 (4th Cir. 2013). In Maryland, "the law of the jurisdiction where the contract was made controls its validity and construction." *Kramer v. Bally's Park Place, Inc.*, 311 Md. 387, 390, 535 A.2d 466 (1988). Plaintiff's application for the credit card account as well as her acceptance of the Cardholder Agreement took place in Maryland. (ECF No. 3 ¶¶ 16, 28, 29). Thus, Maryland law applies to this dispute.[6]
(emphasis added) Id. at 621-622

18. There is an exception to the rule that only a court can decide whether an arbitration agreement was formed. If there is "clear and unmistakable evidence" that the parties agreed to delegate the question of arbitrability to the arbitrator, an arbitrator may have the authority to determine whether he has jurisdiction. However, in *Johnson v. Continental Finance Company, LLC,* 131 F.4th 169, 175 (4th Cir. 2025), another case arising under Maryland Contract Law, the U.S. Court of Appeal: (a) first recognized the rule that a court, not an arbitrator, must decide whether an arbitration agreement was formed ("We agree with the district court that the threshold issue of contract formation is for the district court, not the arbitrator"); then (b) rejected the Defendant's argument that a delegation clause gave the arbitrator the authority to decide whether an arbitration agreement had been formed:

Continental sees it differently. In its view, the text of the arbitration provision itself requires that contract-formation issues be resolved in arbitration. It points us to the arbitration provision's "delegation clause," which requires that "[a]ll issues of arbitrability must be arbitrated, including but not limited to whether the [Arbitration] Provision is enforceable or applicable." J.A. 170. According to Continental, Johnson and Crider's formation challenge is an "issue[ ] of arbitrability" because the arbitration provision is not "enforceable or applicable" if the agreement in which it is contained was never formed.

We think this argument is a dead end. Like the arbitration provision, the delegation clause is contained within the cardholder agreement. It would put the cart before the horse to enforce any provision of the agreement, including the delegation clause, before deciding whether the agreement itself was ever formed. *See Rent-A-Center*, 561 U.S. at 68–70, 130 S.Ct. 2772 (holding that delegation provisions are simply "an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce."); *see also Gibbs v. Sequoia Cap. Operations, LLC*, 966 F.3d 286, 291 (4th Cir. 2020). Continental's insistence that we enforce the delegation provision therefore takes us back to square one.
(emphasis added) Id. at 175.

19. Here, as in *Johnson,* the arbitration provisions and any delegation provisions are contained in the

same section of the Respondent's website.  Both are subject to the question whether a valid agreement was formed, which is a question for a court to decide.  Under the Fourth Circuit's reasoning in *Johnson,* the possible existence of a delegation clause does not deprive a court of competent jurisdiction from the authority to decide whether an arbitration agreement has been formed.

20. The outcome would not be different under California Law. In *Brockmn v. Kaiser Foundation Hospitals* (2025) 114 Cal.App.5th 569, the Plaintiff brought a medical malpractice action against health care providers for damages caused by gender affirming care.  The Defendant's petition to compel arbitration was denied on the grounds that the Defendant had failed to carry its burden of proving the existence of an arbitration agreement binding the Plaintiff.  The Court stated the California contract law principle that a party who has not agreed to arbitrate a controversy cannot be compelled to arbitrate:

> While public policy favors contractual arbitration of disputes, arbitration is a matter of contract and a party who has not agreed to arbitrate a controversy cannot be compelled to do so. (*Espejo v. Southern California Permanente Medical Group* (2016) 246 Cal.App.4th 1047, 1057, 201 Cal.Rptr.3d 318 [the public policy favoring contractual arbitration does not apply to those who are not a party to an arbitration agreement, and a party cannot be compelled to arbitrate a dispute that they have not agreed to resolve by arbitration]; *Avery, supra*, 218 Cal.App.4th at p. 59, 159 Cal.Rptr.3d 444 [courts will not infer that the right to a jury trial has been waived absent a clear agreement between the parties for the arbitration of disputes]; see also *Laymon v. J. Rockcliff, Inc*. (2017) 12 Cal.App.5th 812, 820, 219 Cal.Rptr.3d 185 [noting that the contractual terms must be carefully examined before the parties to the contract can be ordered to arbitration].) Thus, a court, before granting a petition to compel arbitration, " '*must* determine the factual issue of "the existence or validity of the arbitration agreement." ' " (*Chambers v. Crown Asset Management, LLC* (2021) 71 Cal.App.5th 583, 590, 286 Cal.Rptr.3d 535.)  (emphasis added)
> Id. at 584-585

21. California's analysis of delegation clauses was specifically addressed in *Jack v. Ring LLC,* (2023) 91 Cal.App.5th 1186.  There, the plaintiff filed a consumer class action against the manufacturer of a door bell and security camera system.  The defendant manufacturer moved to compel arbitration and the Court of Appeal upheld the denial of the motion. Id. at 1191-1192.

22. The Court of Appeal rejected the argument that adoption of an arbitral institution's rules constitute clear and unmistakable delegation to the arbitrator of the threshold issue of arbitrability:

> The arbitration provision specifies that arbitration will be administered by JAMS, "pursuant to JAMS Streamlined Arbitration Rules & Procedures then in effect" (JAMS Rules). Ring submitted evidence that JAMS Rules in effect as of July 1, 2014, provided that "[j]urisdictional and arbitrability disputes, including disputes over the ... validity ... of the agreement under which Arbitration is sought ... shall be submitted to and ruled on by the Arbitrator" and the "Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter."
>
> We recently held that a similar reference to the American Arbitration Association (AAA) Commercial Arbitration Rules (which, like the JAMS Rules provide that the arbitrator has authority to rule on the validity of the arbitration agreement) did not constitute clear and

6

unmistakable delegation in the context of an arbitration agreement in the terms of service governing the relationship between a mobile gaming platform and its users. (*Gostev v. Skillz Platform, Inc.* (2023) 88 Cal.App.5th 1035, 305 Cal.Rptr.3d 248.) We acknowledged contrary federal authority on the issue, but we agreed with the reasoning of *Ajamian, supra,* 203 Cal.App.4th at page 781, 137 Cal.Rptr.3d 773, *Beco v. Fast Auto Loans, Inc.* (2022) 86 Cal.App.5th 292, 306, 302 Cal.Rptr.3d 168, and *Eiess v. USAA Federal Savings Bank* (N.D. Cal. 2019) 404 F.Supp.3d 1240, 1252–1254. For the reasons explained in *Gostev*, we conclude mere reference to JAMS Rules in the arbitration provision does not constitute clear and unmistakable delegation to the arbitrator of threshold issues of enforceability. (emphasis added)  Id. at 1201)

23. In the case relied upon by the *Ring* court, *Gostev v. Skillz Platform, Inc.* (2023) 88 Cal.App.5th 1035, the Court of Appeal relied in turn on an earlier case, *Ajamian v. CantorCO2d, L.P.* (2012) 203 Cal.App.4th 771, in applying the rule that "a court, not an arbitrator, will decide in the first instance whether a dispute is arbitrable (Id. at 1048), and that a delegation clause will not be enforced unless it is "clear and unmistakable." Id.  Applying these rules, the *Gostev* court found that even a broadly worded delegation clause ("any dispute action , or other controversy between you and us concerning these Terms.") did not clearly and unmistakably delegate the threshold question of arbitrability to the arbitrator because it could be inferred that the broad language applied only to substantive disputes, not to the threshold question whether the arbitration agreement was enforceable:

> In *Ajamian*, the plaintiff brought employment claims against her former employers, the defendants petitioned to compel arbitration, and the trial court denied arbitration on the ground the agreement was unconscionable. (*Ajamian, supra,* 203 Cal.App.4th at pp. 775, 779, 137 Cal.Rptr.3d 773.) On appeal, the defendants argued the question of unconscionability should have been decided in arbitration. The arbitration provision in that case provided, " 'Any *disputes,* differences or *controversies arising under this Agreement* shall be settled and finally determined by arbitration,' " and " 'It is expressly agreed that arbitration as provided herein shall be the exclusive means for determination of *all matters arising in connection with this Agreement* and neither party hereto shall institute any action or proceeding in any court of law or equity other than to request enforcement of the arbitrators' award hereunder. The foregoing sentence shall be a bona fide defense to any action or proceeding instituted contrary to this Agreement.' " (*Ajamian, supra,* 203 Cal.App.4th at p. 783, 137 Cal.Rptr.3d 773, italics added.)

> The Court of Appeal rejected the defendants' delegation argument. The court reasoned: "It is true that one reasonable inference from this language is that the parties, in designating arbitration as the exclusive means for determining '*[a]ny* disputes, differences or controversies' (and precluding court actions and providing a defense to them on this ground) intended that even threshold issues of unconscionability would be decided by the arbitration panel. But another reasonable inference is that all of this language is only intended to bring within the exclusive scope of arbitration all *substantive* disputes, claims or controversies on which a court action might otherwise be brought, while the *enforceability* of the arbitration provision itself remains a matter for determination by a court. Indeed, because that is the usual expectancy of the parties, the absence of any express language pertaining to threshold enforceability questions either reinforces that proposition or at least fails to cure the ambiguity. In light of the possibility of these two

7

conflicting inferences, the language fails to meet the test of *clear and unmistakable* evidence." (*Ajamian, supra,* 203 Cal.App.4th at p. 783, 137 Cal.Rptr.3d 773.)

The *Ajamian* court further explained: "Language such as 'any disputes, differences or controversies' may well be adequate and necessary for the parties to express their intention to arbitrate all *substantive* claims, since the number and diversity of potential future substantive claims is so great as to defy a specific enumeration of each type. But the issue of who would decide the enforceability of the arbitration clause *itself* is a horse of a different color. It is a distinct issue that could and would be easily addressed—if the parties actually contemplated it at the time of contracting—by stating expressly that the arbitrator shall decide questions of the enforceability of the arbitration provision. Because such issues are normally decided by the court, parties who consider the matter and want the issues to be decided instead by the arbitrator would most likely spell out their unusual intention in the arbitration provision. The absence of such express language (or extrinsic evidence to the same effect) therefore gives rise to the inference that the parties did *not* consider the matter. Indeed, because the issue is arcane and *not* likely contemplated by the parties, silence or ambiguity as to who would decide the enforceability of the arbitration provision suggests it was not a matter on which the parties mutually agreed and, therefore, the enforceability issue *cannot* be arbitrated—no matter how much public policy favors the notion of arbitration generally." (*Ajamian, supra,* 203 Cal.App.4th at pp. 786–787, 137 Cal.Rptr.3d 773.)  (emphasis added)
Id. at 1048-1049

24. Turning to the arbitration provisions in the present case, Respondent's Terms contain broad language but also exceptions that favor Respondent and could be deemed unconscionable for lack of mutuality:

You agree that the sole and exclusive forum and remedy for any and all disputes and claims that cannot be resolved informally and that relate in any way to or arise out of your use of any of the Sites and these Terms shall be final and binding arbitration, except to the extent that you have in any manner infringed upon or violated or threatened to infringe upon or violate any of the Total Wine Entities' or any third party patent, copyright, trademark, trade secret, privacy or publicity rights, in which case you acknowledge that there is no adequate remedy at law and that injunctive or other appropriate relief may be sought by the Total Wine Entities and/or the applicable third party(ies) either in court or from an arbitrator. (emphasis added)
(Resp. Exh. F: Terms & Conditions).

A similar exception for intellectual property claims was deemed unconscionable in *Gostev* ("We conclude the lack of mutuality in the promises to arbitrate in the Terms of Service is substantively unconscionable.")  *Gostev, supra,* 88 Cal.App.5th at 1058.  The question of unconscionability of an arbitration agreement is another issue that California Law would have a court decide.

25. Respondent's Terms contains a delegation clause providing that "Arbitration under this Agreement shall be conducted by the American Arbitration Association ("AAA"). (Resp. Exh. F: Terms & Conditions).  The arbitration shall be administered by AAA pursuant to its Consumer Arbitration Rules.

26.  AAA's Consumer Arbitration Rule R-7(a) provides that arbitrators have the power to rule on

8

their own jurisdiction:

(a) The arbitrator shall have the power to rule on their own jurisdiction, including any objections with respect to the existence scope, or validity of the arbitration agreement or the arbitrability of any claim or counterclaim.

(b) The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part.  Such an arbitration clause shall be treated as an agreement independent of the terms of the contract.  A decision by the arbitrator that the contract is null and void shall not, for that reason alone, render invalid the arbitration clause.

(c) A paty must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the established due date for the filing of the answer to the claim or counterclaim that gives rise to the objection.  The arbitrator may rule on such objections as a preliminary matter or as part of a final award.

27. If enforced as a clear and unmistakable delegation clause, AAA Consumer Arbitration Rule R-7(a) would give the arbitrator the authority to decide whether an arbitration agreement was formed.  However, in *Gostev,* the Court of Appeal held that AAA's Commercial Arbitration Rule R-7(a), which also provided that "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim," was not a clear and unmistakable delegation clause in an Terms of Service agreement between an online video game platform user and the platform operator, absent  "any evidence that [the user] possesses a heightened level of sophistication." Id. at 1051.  The *Gostev*  Court distinguished a case between corporate buyers and sellers of internet-based multimedia and entertainment business, *Dream Theater, Inc. v. Dream Theater* (2004), 124 Cal.App.4th 547, 557, which held that an agreement's designation of arbitral institution rules specifying that the arbitrator would decide the scope of his or own jurisdiction, was a clear and unmistakable delegation clause as between sophisticated business entities.  *Gostev, supra,* 88 Cal.App.5th at 1051.

28. In the *Ring* case that relied upon *Gostev*, the Court similarly rejected the defendant's argument that a contractual delegation clause, which incorporated the arbitration rules of JAMS, gave the arbitrator the authority to decide whether an arbitration agreement had been formed:

> The arbitration provision specifies that arbitration will be administered by JAMS, "pursuant to JAMS Streamlined Arbitration Rules & Procedures then in effect" (JAMS Rules). Ring submitted evidence that JAMS Rules in effect as of July 1, 2014, provided that "[j]urisdictional and arbitrability disputes, including disputes over the ... validity ... of the agreement under which Arbitration is sought ... shall be submitted to and ruled on by the Arbitrator" and the "Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter."

> We recently held that a similar reference to the American Arbitration Association (AAA) Commercial Arbitration Rules (which, like the JAMS Rules provide that the arbitrator has authority to rule on the validity of the arbitration agreement) did not constitute clear and unmistakable delegation in the context of an arbitration agreement in the terms of service governing the relationship between a mobile gaming platform and its users. (*Gostev v. Skillz Platform, Inc*. (2023) 88 Cal.App.5th 1035, 305 Cal.Rptr.3d 248.) We acknowledged contrary federal authority on the issue, but we agreed with the reasoning of *Ajamian, supra*, 203 Cal.App.4th at page 781, 137 Cal.Rptr.3d 773, *Beco v. Fast Auto Loans, Inc*. (2022) 86

9

Cal.App.5th 292, 306, 302 Cal.Rptr.3d 168, and *Eiess v. USAA Federal Savings Bank* (N.D. Cal. 2019) 404 F.Supp.3d 1240, 1252–1254. For the reasons explained in *Gostev*, we conclude mere reference to JAMS Rules in the arbitration provision does not constitute clear and unmistakable delegation to the arbitrator of threshold issues of enforceability. (emphasis added) *Ring, supra,* 91 Cal.App.5th at 1201.

29. In the present case, Claimant's Motion specifically seeks a ruling that no arbitration agreement was formed: "The Arbitrator should now find no agreement to arbitrate and grant Claimant leave to seek fees and costs." (Motion at 2:19-20).  Under the facts of this case, this Arbitrator does not have jurisdiction to decide the question whether an arbitration agreement was formed under the FAA, Maryland, or California Law.  Only a court has jurisdiction to decide that question.

30. Respondent has argued that Claimant waived any objections to arbitration by initiating this arbitration proceeding and participating in the arbitration.  There are two problems with the waiver argument.  First, the Claimant specifically reserved the right to contest the enforceability of Respondent's arbitration provisions and limited her arbitration demand to that issue. Respondent's waiver argument would not resolve the core issue of whether Claimant must arbitrator her substantive claims against Respondent.  Second, the waiver argument presumes that there was an arbitration agreement, the existence or non-existence of which must be decided by a court.  Even if both parties wish to arbitrate their dispute, they are not in agreement as to the scope of the issues to be arbitrated.  If the court finds that such an agreement was formed, the court would also have the jurisdiction to decide the scope of the arbitration agreement.

31.  Because the threshold issue of whether an arbitrator has the jurisdiction to decide whether there is an arbitration agreement must be answered in the negative, the remaining arguments raised on each side need not be addressed at this time.  This Arbitration should be stayed pending a decision by one or both of the parties whether to seek a judicial determination of the issue whether an arbitration agreement was formed and, if so, the scope of such an agreement.

32. Although we are beyond the 30- day time limit for seeking judicial intervention and a 90-day suspension of arbitration prescribed by AAA Consumer Arbitration Rule R-2 "Judicial Intervention," the 90-day period under Rule R-2 would be a reasonable benchmark for the length of the initial stay.  Rule R-2 also provides that AAA may extend the suspension on its own initiative or at a party's request for good cause made before the expiration of the initial suspension or any approved extension.  Again, although Rule R-2 is not applicable to this Motion because we are beyond the 30-day period to seek judicial intervention, court proceedings may last longer than 90 days and additional time may be needed for a judicial process to reach its conclusion.

**STAY & SCHEDULING ORDER**

33. Accordingly, the Arbitration is STAYED for an initial period of 90 days from the date of this Decision Re Arbitrability, subject to extension, and no decision is made on the Motion.

34. A further remote preliminary hearing is scheduled for June 9, 2026 at 11:00 a.m. Pacific Time, at which time the parties are requested to report whether either party has filed a court proceeding and the status of any such proceeding.  The preliminary hearing may be vacated or continued if the parties report earlier than June 9th or need more time to report on the status of any judicial proceedings.

10

March 9, 2026
            Date

                                                  Phillip Francis Shinn, Arbitrator

# EXHIBIT C

**American Arbitration Association**

**Consumer Arbitration Rules**

**ORDER Re: Dismissal Without Prejudice**

Case Number: 01-25-0000-1611                    Date: June 11, 2026

**Robin Savage**
**-vs-**
**Retail Services & Systems, Inc.**

**By agreement of the parties or order of the arbitrator, the following is now in effect:**

1. On June 9, 2026, a further preliminary hearing was held remotely, pursuant to the Arbitrator's March 9, 2026 Decision Re Arbitrability. In that Decision, the arbitrator decided that a court, not the arbitrator, has jurisdiction to decide whether an enforceable agreement to arbitrate was made between the parties, and stayed this arbitration for approximately 90 days.

2. At the June 9, 2026 preliminary hearing: Francisco Rolon, Esq. appeared on behalf of Claimant Robin Savage, Isabelle Ord, Esq. appeared on behalf of Respondent Retail Services & Systems, Inc, and Priscilla Cortez attended on behalf of the American Arbitration Association.

3. Claimant reported that, due to a medical issue involving one of Claimant's counsel, the Claimant was not able to file a court proceeding regarding the arbitrability of this matter before the expiration of the stay on June 9, 2026, and Claimant seeks additional time to seek Court relief.

4. Respondent contended that the Claimant's time for seeking judicial intervention has expired pursuant to AAA Consumer Arbitration Rule R-2. Accordingly, Respondent requested that this arbitration be dismissed.

5. Claimant seeks to preserve her right to pursue arbitration if a Court of competent jurisdiction (hereafter, "the Court") permits, but Claimant is amenable to a dismissal of this arbitration without prejudice while she seeks relief from the Court for purposes of going forward with the arbitration.

6. It is the Arbitrator's understanding that, although both parties are amenable to a dismissal of this arbitration, Claimant seeks a dismissal without prejudice to the re-filing of the arbitration if she is able to obtain a Court order allowing her to proceed with arbitration, while Respondent's position is that the Claimant is barred from re-filing the arbitration because the time for her to seek judicial intervention under Consumer Rule R-2 has expired.

7. As this Arbitrator does not have the authority to decide whether a valid agreement to arbitrate has

1

been reached between the parties, and because no Court has ruled whether such an agreement exists, the Arbitrator does not currently have the power to rule on the substance of the claims made or defenses raised in the arbitration.

ORDER

8.  In order to avoid wasting the resources of the parties by staying the arbitration again without any certainty as to whether, when or how the Court might intervene, this arbitration is dismissed without prejudice to its being refiled in the event that the Court orders the arbitration to proceed or grants Claimant leave to re-file her demand for arbitration.

This order shall continue in effect unless and until superseded by a subsequent order of the Court.

__June 11, 2026____                    _____
        Date                            Phillip Francis Shinn, Arbitrator

2